

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:25-cv-417

Charity Mainville,

      Plaintiff,

v.

Eugene Soar, David
Yopp, Margaret Eagles, Christine
Walczyk, Vartan Davidian III,
John Does 1-3,

      Defendants

**PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e)**

## INTRODUCTION

Plaintiff respectfully moves this Court to alter or amend the final order entered on May 24, 2025, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. The order denied Plaintiff's request for injunctive relief under 42 U.S.C. § 1983 without addressing the underlying constitutional violations, factual basis, or the express request for the identification of judicial actors whose concealed involvement has created ongoing and irreparable harm. The Court's ruling mischaracterizes Plaintiff's claims as vague and unsupported, while disregarding the submitted exhibits, verified allegations, and procedural record.

This Motion is not filed to reargue settled issues but to correct clear errors of law and fact, prevent manifest injustice, and preserve

1

constitutional rights which are being actively undermined by judicial concealment and institutional failures across multiple courts.

## EXPANDED PROCEDURAL CONTEXT AND FACTUAL CLARIFICATION

As stated in Judge Osteen's order (Doc. 6 at 1), the Court provided a limited summary of the case's history that failed to include critical legal context or procedural grounds for the requested injunctive relief. While Plaintiff was forthright in disclosing prior filings—including a voluntarily dismissed case—the Court appeared to interpret this disclosure as an indicator of forum shopping or improper tactics. Plaintiff disputes that interpretation and submits the following procedural background to clarify the record.

This action arises from a prolonged pattern of constitutional violations rooted in a small claims dispute originally filed in Wake County Small Claims Court (24-CV-022933-910) on July 22, 2024, and a discrimination and retaliation complaint filed with the NCHRC on August 8, 2024. On August 21, 2024, Defendant Anna De Santis and De Santis Rentals, LLC were cited by the City of Raleigh (UFH-001758-2024) for 14 housing code violations—with the letter expressly stating that she violated the law.

However, on August 26, 2024, the presiding Magistrate disregarded the evidence, failed to rule accordingly, and acted with unjustified aggression and hostility toward Plaintiff despite awarding relief in two other small claims cases involving similar circumstances.

On September 3, 2024, Plaintiff attempted to resolve the matter through the appropriate agencies and state-level mechanisms but was met with

2

irregular dismissals, improper denials, and refusal to acknowledge filings—a pattern that continued and deepened.

Although current discovery is obstructed in her state-level case, there is documented evidence of false statements during the small claims hearing and counterclaim filing, along with interference and obstruction in two separate government investigations—including the NCHRC's mishandled inquiry and the refusal of the Office of Administrative Hearings to hold them accountable following Plaintiff's contested case petition (25 HRC 00824).

While the precise origins of these coordinated procedural obstacles remain unclear, it is procedurally sound to infer undue influence by Defendant De Santis due to her socioeconomic status and potential connections within the legal and political community.

On April 22, 2025, Plaintiff attempted to stop ongoing violations and consolidate her claims into a federal action requesting a TRO to avoid the necessity of filing a §1983 complaint. That effort, however, was barred by the Anti-Injunction Act (28 U.S.C. § 2283) because although the FHA qualifies under civil rights protections enacted by Congress, Plaintiff could not yet establish that Defendant De Santis acted under color of law—thus preventing the bypass of AIA restrictions.

On May 2, 2025, after continued violations and direct interference with Plaintiff's Interlocutory Appeal, she filed another Emergency TRO with Wake County District Court. That request was not addressed for twelve days and then denied without explanation via rubber-stamped on complaint.

On May 15, 2025, Plaintiff filed in the Eastern District of North Carolina under §1983 with an ex parte TRO. Judge Dever denied the motion, implied retaliatory motives, and dismissed Plaintiff's request for reasonable accommodations—without hearing, fact-finding, or legal analysis. One

defendant named in that matter had a known academic association with the judge. Plaintiff has since filed a judicial misconduct complaint with the Fourth Circuit.

On May 23, 2025, Plaintiff refiled in the Middle District, seeking a fair and impartial review. The complaint outlined 27 discrete incidents of procedural misconduct, violations of law, and obstructive conduct. These were not speculative allegations, but substantiated incidents supported by the case record and Plaintiff's verified statement[1], with further evidence available upon the Court's request—each linked to real harm within a five-month span.

Notably, had the law been properly applied at any stage, Plaintiff would have obtained declaratory relief as early as August 26, 2024, November 13, 2024, or January 23, 2025. Plaintiff was further obstructed from seeking summary judgment when the court granted opposing counsel an excessive 90-day response period in a matter already litigated through small claims and arbitration.

## GROUNDS FOR RULE 59(E) AND RECONSIDERATION OF RULING

Plaintiff moves under Rule 59(e) to correct a clear error of law and prevent manifest injustice. Reconsideration is appropriate where, as here, the Court's ruling misapprehends material facts or applies an incorrect legal standard resulting in unjust consequences. *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007).

---

[1] *See* Fed. R. Civ. P. 11(b) (requiring factual contentions to have evidentiary support or be likely to have such support after a reasonable opportunity for investigation or discovery).

4

### 1. Mischaracterization of Verified Evidence and Legal Harm

In denying Plaintiff's Emergency Motion, the Court concluded that Plaintiff's assertion of harm to her appellate rights was "vague, conclusory, and insufficient" to satisfy Rule 65's "stringent restrictions." (Doc. 6 at 4.) This mischaracterizes the record and disregards both Plaintiff's verified statement under penalty of perjury and the supporting exhibit, which outlined procedural interference, including improper service, obstruction of docketing, and denial of access to a judicial signature.

Judge Eagles's May 12, 2025 order was not only untimely—entered six days past the jurisdictional deadline—but was also improperly served to Defendant Anna De Santis personally rather than to her attorney of record, and simultaneously sent to an outdated address for Plaintiff that the Court had previously updated. This constitutes a direct violation of Rule 11(c) and basic service procedures. The corresponding Court of Appeals order—issued under unclear authority—failed to cite any procedural rule permitting these irregularities, and Plaintiff could locate no case law allowing such service or jurisdictional deviation. Contrary to the Court's characterization, it is these judicial actions—not Plaintiff's filings—that are "vague, conclusory, and insufficient," lacking legal foundation and inflicting actual prejudice. (See Doc. 1, Exhibit A at pp. 43–50).

The Court's reliance on *Turner v. Clelland*, No. 1:15CV947, 2016 WL 1069665, at *3 (M.D.N.C. Mar. 16, 2016), is misplaced. That case does not justify denial—it reinforces that Rule 65(b) demands specific procedural safeguards, all of which Plaintiff satisfied.

Under Rule 65(b)(1)(A), a movant must provide "specific facts in an affidavit or a verified complaint" clearly showing that "immediate and irreparable injury, loss, or damage will result… before the adverse party can

5

be heard." Plaintiff met this standard through a verified complaint, filed under penalty of perjury, supported by court records detailing not hypothetical harm, but concrete interference: improper service, record manipulation, unexplained judicial concealment, and suppression of critical filings. These violations are not speculative—they are evidenced by filings and orders.

The Court's ruling, if not reconsidered, will directly force Plaintiff to either submit a defective Record on Appeal or file a Notice of Violation and attempt to proceed under Rule 11(b) on May 30, 2025 to preserve the issue—despite a prior attempt being improperly rejected. In her Emergency Motion, Plaintiff identified May 27 as the filing deadline based on a plain reading of the judicial order's entry date. However, due to improper service—including mailing to an outdated address and failure to serve electronically—Plaintiff now invokes the three-day extension under Rule 27(b) as a protective measure.

This shifting deadline, created entirely by defective service, exemplifies the procedural confusion and legal prejudice Plaintiff seeks to prevent. The Court cannot overlook the fact that forcing submission of a defective Record on Appeal—without the ability to include key evidence of judicial misconduct—permits the state court to insulate itself from scrutiny and potentially continue issuing prejudicial rulings without consequence. On the other hand, attempting to preserve the integrity of the record through a Rule 11(b) filing risks dismissal for noncompliance with a procedurally invalid order. Plaintiff emphasizes that there is no precedent or clear path for protecting her appellate rights under these manipulated conditions— conditions opposing counsel has deliberately engineered to corner Plaintiff

6

procedurally and force waiver through exhaustion, which this Court is effectively supporting by denying her TRO.

Under Rule 65(b)(1)(B), Plaintiff more than met the certification requirement. She repeatedly informed the Court—through formal notices—that explicitly warned, across multiple filings, that if judicial and procedural misconduct continued, she would be forced to file a §1983 action. The fact that the Court allowed these violations to continue even after Plaintiff raised them in her TRO reinforces the urgency of her claims and the credibility of her harm. The procedural requirements were not just satisfied—they were actively ignored.

The Court's quotation that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute" only underscores Plaintiff's point. In this case, it is Plaintiff—not the Defendants—who has been denied that opportunity. Plaintiff has faced retaliation and escalating harm simply for trying to preserve her rights. That quote does not weigh against relief—it compels it.

The Court further held that the "TRO must be denied" based on the general presumption that our jurisprudence disfavors action before notice and a hearing. *Id.* This fails to account for Rule 65(b)(1)'s specific allowance for temporary relief where irreparable injury will occur before notice is possible. The judicial misconduct Plaintiff seeks to enjoin—including refusal to identify adjudicating officials and attempted suppression of appellate filing—necessitated precisely the sort of narrowly tailored, time-sensitive relief Rule 65(b) authorizes.

**2. Legal Error in Applying Winter Standard and Prejudgment of Merits**

The Court's reliance on *Winter* to dismiss Plaintiff's TRO on the grounds of "likelihood of success" is not only inconsistent with its own implicit recognition that the claim survives Rule 12(b)(6), but also reflects a deeper logical and institutional inconsistency. A Rule 12(b)(6) survival confirms the claim is legally valid, grounded in specific facts, and entitled to move forward. Plaintiff has not asserted a single speculative harm or theoretical violation—she has alleged 27 distinct constitutional violations, all verifiable and tethered to procedural filings and judicial records. The statistical probability of even a subset of these going unaddressed without resulting harm is minimal.

To claim that such a filing lacks a "likelihood of success" at trial—when the Court will preside over that very trial—raises concerns about judicial neutrality. If Plaintiff's TRO is denied on the basis that she is unlikely to win before this Court, then the Court is signaling in advance that her evidence and arguments will not be given fair weight. This results in a structural prejudgment of her claims without a hearing, undercutting the adversarial process itself.

This is not judicial restraint—it is an institutional tactic often deployed against pro se litigants to exhaust and destabilize them. When judicial language implicitly questions the competence or clarity of a verified complaint, despite acknowledging its legal sufficiency, it crosses the line into judicial gaslighting.[2] Such tactics violate Canon 3(A)(3) of the

---

[2] Gaslighting is "a form of manipulation aimed at making someone doubt their perception of events, experiences, or understanding," a tactic increasingly acknowledged as a litigation issue, particularly in power-imbalanced proceedings. See American Bar Association, *"Gaslighting in Litigation,"* https://www.americanbar.org/groups/litigation/resources/newsletters/woman-advocate/gaslighting-litigation/

Code of Conduct for United States Judges, which requires judges to be "patient, dignified, respectful, and courteous" to litigants, including pro se parties. The Court cannot simultaneously decline to dismiss a complaint while treating the same complaint as presumptively meritless at the emergency relief stage.

Moreover, Plaintiff is not required at the complaint or TRO stage to submit every piece of supporting evidence. Rule 8 requires a "short and plain" statement of the claim—not a trial-ready evidentiary production. Plaintiff offered to provide additional documentation and stated under penalty of perjury that all facts alleged were true and supported by filings. That should be sufficient for this stage. To expect a pro se litigant to print, organize, and submit over 200 pages of detailed evidence—particularly when the Court is unlikely to thoroughly review that volume in an emergency motion—creates an undue burden that has no basis in the Federal Rules of Civil Procedure. This demand not only punishes Plaintiff for proceeding pro se, it undercuts the trust the judicial system is expected to extend when a sworn verified statement has been made.

### 3. Mischaracterization of Statutory Standard

The Court's order incorrectly applies footnote 4 from Plaintiff's Verified Complaint (Doc. 1 at 10 n.4), which cites *Pulliam v. Allen*, 466 U.S. 522 (1984), as though it were central to Plaintiff's Emergency Motion. That citation was included only in the context of Plaintiff's broader §1983 complaint—not in the TRO—and is not material to this motion. Regardless, Plaintiff did not assert that *Pulliam* remained unqualified authority post-1996; rather, Plaintiff's verified claim and TRO both assert that declaratory relief has been effectively unavailable, triggering the statutory exception under §1983.

9

**4. Material Misstatement of Judicial Defendants and Misapplication of §1983 Standard**

The Court incorrectly states that Plaintiff's §1983 action concerns "six North Carolina judges," implying that all six acted in their judicial capacities and are therefore shielded under 42 U.S.C. §1983. (Order at 6). This is a material misstatement. Plaintiff's Verified Complaint identifies three specific judges—Judge Eagles, Judge Walczyk, and Judge Davidian—and includes "John Does 1–3" to account for unidentified appellate officials who issued unsigned, procedurally irregular orders. Plaintiff explicitly noted that she does not know how many appellate judges were involved, due to the lack of signatures and the court's refusal to disclose adjudicator identity.

Alternatively, as Plaintiff has alleged, it may be that none of the appellate judges were involved, as the unsigned orders appear inconsistent with prior precedent and standard jurisdictional practice within the Court of Appeals. This raises the serious possibility that these orders were issued or manipulated without proper judicial review, potentially by or at the direction of Defendant Soar, the appellate clerk. The Court's presumption—without factual or procedural confirmation—undermines the central allegation and reflects a factual error requiring correction under Rule 59(e).

Moreover, the Court issued no ruling at all on Plaintiff's request for identification of the judicial actors involved. This omission is central to the dispute. Plaintiff requested this disclosure precisely because continued concealment obstructs due process, frustrates proper service, and eliminates avenues for declaratory relief—thus triggering the §1983 exception. The refusal to release judicial names is not rooted in law, but rather appears aimed at shielding misconduct from scrutiny. Plaintiff supported this claim

10

with evidence as Exhibit A to her Verified Complaint (Doc. 1), showing that a nearly identical pattern of obstruction and procedural abuse occurred over three years ago involving Defendant Yopp—a pattern this Court has now declined to investigate or even acknowledge. The Court's failure to address this core claim, combined with its misstatement of the record, warrants reconsideration under Rule 59(e) to correct clear legal and factual error.

### 5. Misapplication of "Color of State Law" Standard as to Defendant Yopp

The Court cites the correct legal standard regarding "a sufficiently close nexus with the State," yet fails to apply it properly. The Court's conclusion that Plaintiff's §1983 claim against Defendant Yopp is unlikely to succeed because he is a private attorney misrepresents both the record and controlling law. (Order at 6-7). Plaintiff is fully aware that §1983 applies only to those acting under color of state law and does not allege liability based on Yopp's private status alone. Rather, Plaintiff alleges that Defendant Yopp's conduct—including filing unauthorized motions in closed dockets, manipulating procedural filings, and supporting evidence of two instances of ex parte communication with judges—demonstrates coordinated interference with judicial proceedings. These are not actions of a neutral third party but of a participant engaged in sustained procedural manipulation alongside state actors. Such conduct, when viewed in context with verified patterns involving Defendant Soar and judicial officials, satisfies the "close nexus" test and supports a plausible claim that Yopp acted under color of state law.

11

## ESCALATION OF HARM AND UNDUE BURDEN

Each procedural denial and mischaracterization by the Court has escalated the harm suffered by Plaintiff. The Court's refusal to intervene has not preserved neutrality—it has enabled procedural misconduct to continue unaddressed. Plaintiff has now been forced to file this matter for a fourth time, not out of dissatisfaction with legal outcomes, but because each court—state and federal—has sidestepped the facts, ignored misconduct, or prematurely judged the claims without evidence or hearing. The Court's current ruling follows the same path: misstating Plaintiff's allegations, misapplying standards, and evading direct rulings on judicial accountability. Worse, it does so while insinuating bad faith on the part of a self-represented litigant who has submitted verified filings, cited governing law, and pleaded for transparency.

Furthermore, Plaintiff will be forced to submit a Record on Appeal under protest or risk waiver through delay, all while the responsible actors remain shielded. This is not a hypothetical harm; it is cumulative, immediate, and materially prejudicial. No litigant—pro se or otherwise—should be required to bear such institutional burden merely to access the courts.

## JUDICIAL INTEGRITY AND CANON DUTIES

Plaintiff recognizes that this case places the Court in an uncomfortable position—reviewing actions implicating fellow members of the judiciary. Yet that discomfort cannot justify the Court's failure to address verifiable misconduct, mischaracterize evidence, or ignore binding procedural obligations. Canon 1 of the Code of Conduct for United States Judges mandates

12

that judges "uphold the integrity and independence of the judiciary." Canon 3 requires that a judge "perform the duties of the office fairly, impartially and diligently" and "be patient, dignified, respectful, and courteous to litigants." These duties are not discretionary; they are the foundation upon which public trust rests.

Plaintiff did not pursue this litigation lightly. She tried every alternative—agency complaints, formal grievances, state-level filings, emergency motions. No attorney would take the case, not because it lacks merit, but because it challenges the very structure from which they draw credibility. This Court's integrity—and the legacy of its decisions—should not be measured by institutional loyalty but by its fidelity to justice. As Socrates said, "It is better to suffer injustice than to commit it."

Plaintiff does not ask the Court to condemn its peers. She asks the Court to honor its oath. To recognize that failure to act—despite verified misconduct—breeds public cynicism, not trust. And that integrity, especially when difficult, is what defines judicial legacy—not procedural avoidance cloaked in doctrine.

For ten months, Plaintiff has been gaslighted, dismissed, and attacked—not for lack of merit or procedure—but for insisting on basic justice. Courts have labeled her as dissatisfied, confused, combative, unknowledgeable, or incompetent, despite the fact that not a single motion she has filed has been dismissed or stricken for procedural defect or contained errors. Meanwhile, nearly every filing from opposing counsel has contained falsehoods, improper service, or legal violations—and yet continues to receive institutional protection.

Plaintiff's insistence on accountability is not hostility—it is a defense mechanism born of exhaustion and necessity. Being trapped in a

13

prolonged fight-or-flight state, forced to repeatedly relitigate basic due process rights, is not sustainable. It is not legal disagreement; it is abuse—emotional, procedural, and systemic. What this Court and others have mischaracterized as confrontation is, in fact, a constitutionally rooted response from someone recently diagnosed with AuDHD—a condition widely associated with heightened justice sensitivity and acute pattern recognition.[3] When those faculties are repeatedly violated, the result is not confusion—it is direct psychological and emotional harm. That Plaintiff must disclose such a deeply personal matter merely to contextualize her response to ongoing judicial misconduct is not only unjust—it is deeply troubling.

This is not a misunderstanding. This is a violation of a person's right to expect law to be law. And what Plaintiff is exposing is not hypothetical. The pattern includes evidence that the North Carolina Court of Appeals may be issuing or processing false orders. This is not an isolated failure. It is a systemic breakdown. If it can happen to Plaintiff—who documents, challenges, and preserves every detail—it has likely happened to many others who lacked the knowledge or resources to identify it.

Plaintiff has asked for nothing more than an impartial judge—one who will not dissect her filings for technical errors in a search to deny justice, but one who will uphold the integrity of the law, even when it implicates colleagues or institutions. If this Court does not feel it can do

---

[3] AuDHD is a term used to describe co-occurring autism and ADHD traits, especially in women. While Plaintiff's diagnosis is not yet formalized by a clinical psychologist, it is supported by evaluations from qualified professionals and Plaintiff's documented history of cognitive assessment, academic performance, and consistent symptom presentation. https://www.verywellmind.com/what-to-know-about-autism-and-justice-sensitivity-8631234

14

so, Plaintiff asks for that to be stated plainly, so she may escalate to a higher court unencumbered by internal loyalty or institutional discomfort.

A judge who believes in the law—who understands the oath they have taken—is now confronted with the greatest responsibility of all: not to protect their own, but to restore the credibility of the very system in which they serve. This is not just about Plaintiff's rights. It is about the foundation of justice in North Carolina. And that, respectfully, is this Court's burden to carry.

This is not speculative concern—it is already occurring in this Court. In Plaintiff's related federal case against Defendant De Santis, the assigned magistrate judge has demonstrated clear bias, leading Plaintiff to file a motion for recusal. Plaintiff has made it explicitly clear to this Court and others: she will no longer tolerate discriminatory treatment, judicial gaslighting, or the erosion of her constitutional rights. This is federal court—its purpose is not to mirror the indifference of small claims tribunals, but to uphold the rule of law, free from personal bias or professional fatigue. Plaintiff has not moved to recuse this District Judge because she has not made assumptions regarding his impartiality, despite his initial ruling making them about her. But the integrity of this institution depends on every judge rising above peer loyalty and emotional wear to deliver justice grounded in law, not in familiarity or convenience.

## RELIEF REQUESTED

For the reasons stated above, Plaintiff respectfully requests that this Court:

1. Grant reconsideration under Rule 59(e), correcting the misapplication of fact and law in the denial of Plaintiff's Emergency Motion;

2. Grant temporary injunctive relief under Rule 65(b) to preserve Plaintiff's appellate rights and prevent continued procedural interference and irreparable harm;

3. Order disclosure of the identities of the judicial officers involved in unsigned appellate rulings, as required for access to declaratory relief and full adjudication of constitutional claims;

4. Issue any further relief the Court deems just and appropriate to restore Plaintiff's access to a fair and impartial process;

5. **Or, in the alternative,** if the Court stands by its ruling, to clarify the legal basis and procedural justification for each order cited in its denial, and to affirmatively explain why each of the 27 cited incidents does not constitute a violation of state or federal law, or of Plaintiff's constitutional rights, given that Plaintiff has already identified the relevant legal violations associated with each.[4]

Respectfully submitted this 28th day of May, 2025.

Charity Mainville
Plaintiff, Pro Se
2025 Watchorn St, Apt 504
Durham, NC 27703
(608) 215-6654
camainville@gmail.com

---

[4] Should this Court decline to reconsider or correct the record in light of the evidence presented, Plaintiff reserves the right to seek emergency review through a Petition for Writ of Mandamus or other appropriate appellate remedy, pursuant to 28 U.S.C. §1651, to prevent irreparable harm, preserve jurisdiction, and protect the integrity of the judicial process.